UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| INLAND WATERS POLLUTION CONTROL, INC., | ) 1:06CV2697 |
| | ) |
| | ) |
| Plaintiff | ) JUDGE LESLEY WELLS |
| | ) (Magistrate Judge Kenneth S. McHargh) |
| v. | ) |
| | ) |
| MARRA/MAJESTIC JOINT VENTURE, et al., | ) |
| | ) |
| | ) |
| Defendants | ) REPORT AND RECOMMENDED |
| | ) <u>DECISION OF MAGISTRATE JUDGE</u> |

McHARGH, MAG. J.

The plaintiff Inland Waters Pollution Control, Inc. ("Inland") filed a complaint in this court on Nov. 8, 2006, alleging (1) breach of contract, (2) unjust enrichment, (3) promissory estoppel, and (4) action on bond, against defendants Marra/Majestic Joint Venture, Marra Corporation, and several individuals (collectively, "Marra"). (Doc. 1, UNDER SEAL[1].) The dispute arises from a sewer rehabilitation and cleaning project in Cleveland, Ohio. Defendant Marra was the general contractor for the Northeast Ohio Regional Sewer District. Plaintiff Inland was a subcontractor to clean a specific section of sewer pipe.

On July 6, 2007, the court granted in part and denied in part defendants' motion to dismiss. The court granted the defendants' motion with regard to the claims of unjust enrichment in counts 1, 2, 3, 4, and 6, as well dismissing the claim

---

[1] The court issued a sealing order on Jan. 5, 2007. (Doc. 16.)

of promissory estoppel.  The court denied the motion as to the unjust enrichment claim in count 5.  (Doc. 27-28.)

In their answer, filed July 18, 2007, the defendants included a Third-Party Complaint against the Northeast Ohio Regional Sewer District (NEORSD, or "the Sewer District").  (Doc. 30, UNDER SEAL.)

The Sewer District has filed a motion for judgment on the pleadings.  (Doc. 41.)  Marra has filed a brief in opposition (doc. 43, UNDER SEAL), and the Sewer District has filed a reply (doc. 46).

## I.  MOTION FOR JUDGMENT ON THE PLEADINGS

The Sewer District moves for judgment on the pleadings, and contends that the Third-Party Complaint fails to state a claim for which relief can be granted.  (Doc. 41, motion, at 2.)

In ruling on a motion for judgment on the pleadings under Rule 12(c), the court considers all factual allegations of the complaint as true.  Lindsay v. Yates, 498 F.3d 434, 438 (6th Cir. 2007); McKamey v. Roach, 55 F.3d 1236, 1237 (6th Cir. 1995); United States v. Moriarty, 8 F.3d 329, 332 (6th Cir. 1993).  Where a Rule 12(c) motion raises what is essentially a Rule 12(b)(6) defense by challenging the legal basis of the complaint, the analytical framework for the motion for judgment on the pleadings mirrors that used under Rule 12(b)(6).  Amersbach v. City of Cleveland, 598 F.2d 1033, 1038 (6th Cir. 1979).

Until recently, the standard for a motion to dismiss for failure to state a claim upon which relief can be granted was that the motion establish, beyond a reasonable doubt, that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Wright v. Metrohealth Med. Ctr., 58 F.3d 1130, 1138 (6th Cir. 1995), cert. denied, 516 U.S. 1158 (1996).  However, in Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955 (May 21, 2007), the Supreme Court has modified the standard, in particular the "no set of facts" phrase.  See, e.g., Weisbarth v. Geauga Park Dist., 499 F.3d 538, 541 (6th Cir. 2007).

The Court in Bell Atlantic granted certiorari in order "to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct." Bell Atlantic, 127 S.Ct. at 1963.  The Court noted that "proceeding to antitrust discovery can be expensive," particularly in the case before it, where "plaintiffs represent a putative class of at least 90 percent of all subscribers to local telephone or high speed Internet service in the continental United States." Id. at 1967.  However, the Court's subsequent ruling abrogating Conley went far beyond the limited context of conspiracy and antitrust pleadings.

The Court in Bell Atlantic characterized Conley's heretofore universally-accepted[2] "no set of facts" phrase as ". . . best forgotten as an incomplete, negative

---

[2] See, e.g., Bell Atlantic, 127 S.Ct. at 1978 (Stevens, J., dissenting) (citing cases); O'Brien v. University Community Tenants Union, Inc., 42 Ohio St.2d 242, 327 N.E.2d 753 (1975) (syllabus).

3

gloss on an accepted pleading standard:  once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Bell Atlantic, 127 S.Ct. at 1969.  The Court stated that Conley merely "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." Id.

The question inevitably arises:  How then is a claim "stated adequately"? The Court asserts that "before proceeding to discovery, a complaint must allege facts suggestive of illegal conduct." Bell Atlantic, 127 S.Ct. at 1969.  The Court protested that "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Id. at 1974. Compare 5 Wright & Miller, Federal Practice and Procedure, § 1216 (2004) ("Conspicuously absent from Federal Rule 8(a)(2) is the requirement found in the [earlier] codes that the pleader set forth the 'facts' constituting a 'cause of action'.")

The function of the court in ruling on a motion to dismiss is not to weigh the evidence, nor to appraise the credibility of witnesses.  Miller v. Currie, 50 F.3d 373, 377 (6th Cir. 1995).  The Bell Atlantic Court explained that "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." Bell Atlantic, 127 S.Ct. at 1969.

4

## II. ALLEGATIONS OF THE THIRD-PARTY COMPLAINT

Marra's Counterclaim and Third-Party Complaint alleges (1) breach of contract against plaintiff Inland, (2) breach of contract against the Sewer District, and (3) indemnification and contribution against the Sewer District.  (Doc. 30, UNDER SEAL, at pp. 28-33.)

Specifically, as to the breach of contract allegations against the Sewer District, Marra claims that critical errors existed in the engineers' data concerning manholes, which was provided to Marra as part of the request for proposal.  Marra asserts that the manhole openings were smaller than represented in the data.  Upon discovering this error, Marra notified the Sewer District, as provided in the "Differing Site Conditions" provisions of the contract.  See generally doc. 30, UNDER SEAL, DX A, contract.  In particular:

> On September 17, 2003, [Marra] promptly notified the [Sewer District] of the differing site condition relation to the incorrect manhole diameter sizes.  In the September 17, 2003, letter [Marra] stated why the incorrect manhole diameters presented a problem that was catastrophic in nature in that [Marra] could not accomplish the cleaning with the methods and within the time anticipated by Change Order No. 7 and actually created a situation which is much more catastrophic than a collapsed tunnel or hazardous waste.

(Doc. 30, UNDER SEAL, at p. 30.)

Change Order No. 7, issued in May 2003, was an addendum in settlement of a dispute (concerning unanticipated amounts of sediment) under the main contract.  The following portion is relevant to the motion before the court:

> [Marra] will take responsibility for the entire job and shall waive all claims related to the performance of work under the Contract,

5

including, but not limited to, Differing Site Conditions, unless
something catastrophic is encountered (e.g. collapsed tunnel or
hazardous waste as defined under RCRA). This waiver of claims
includes, but is not limited to, claims related to jet grouting, tunnel
connections, geotechnical or geological conditions, sediment quantities
or type, flow velocities or quantities and work hours.

(Doc. 30, UNDER SEAL, DX B; doc. 37, DX G, at ¶ 6.)

The Sewer District rejected Marra's claim that the manhole diameter
discrepancies were a catastrophic condition under Change Order No. 7. (Doc. 30, at
p. 30.) Marra claims that the Sewer District has materially breached the contract
"by failing and refusing to make an equitable adjustment to the EEA Contract to
account for [Marra]'s catastrophic constructability differing site condition claim."
As a result of this breach, Marra incurred significant additional costs. Id. at p. 31.

Marra attached seven exhibits to the Third-Party Complaint: The main EEA
Contract, dated Feb. 2, 2002 (doc. 30, UNDER SEAL, DX A); Change Order No. 7,
dated May 22, 2003 (DX B); four letters between Marra and the Sewer District
regarding the claimed catastrophic manhole dimensions, in the fall of 2003 (DX C-
F); and the Subcontract with Inland, dated Dec. 4, 2003 (DX G).

Regarding the indemnification and contribution allegations, Marra asserts
that final payment under the contract was contingent upon an inspection (and
acceptance) of the work by the Sewer District's engineer. The Sewer District was
responsible for performing the necessary inspections in a timely manner. Marra
contends that a significant portion of plaintiff Inland's claims are based on Marra's
purported failure to timely inspect plaintiff's cleaning work. (Doc. 30, UNDER

6

SEAL, at p. 32.)  Therefore, Marra "is entitled to complete indemnification and/or contribution from the [Sewer District] as it was the [Sewer District]'s exclusive duty and responsibility to timely inspect Plaintiff's cleaning work in the EI Tunnel and the levels of sediment in the EI Tunnel."  Id. at pp. 32-33.

### III. THE SEWER DISTRICT'S MOTION

In support of its motion, the Sewer District argues:

The pleadings have now closed, and Marra/Majestic's reply to [the Sewer District]'s counterclaim has established the authenticity of the documents exchanged between the parties. The undisputed factual record, as evidenced by those documents, shows that Marra/Majestic, upon discovering a "differing site condition" on the project, entered into a binding contract change order with [the Sewer District] under which Marra/Majestic agreed to release [the Sewer District] from any future claim except a claim for a "catastrophic" condition. Marra/Majestic then claimed that such a "catastrophic" condition had been encountered, but in fact Marra/Majestic had encountered what could be characterized, at most, as a situation avoidable through field verification of dimensions.

The undisputed factual record, as set forth in the pleadings and the attachments (the authenticity of which have been admitted by Marra/Majestic), demonstrates that Marra/Majestic's claims are without merit. Marra/Majestic cannot, under any reasonable interpretation of the parties' agreement, describe as "catastrophic" a field condition that would have been easy for Marra/Majestic to verify – especially where, as here, Marra/Majestic had a contractual duty to verify the condition – before entering into the aforementioned Change Order.  The factual record also demonstrates that Marra/Majestic already waived, or released [the Sewer District] from, any further claims under the parties' agreement through final acceptance and final payment by [the Sewer District].

Indeed, Marra/Majestic cannot claim that an allegedly catastrophic condition occurred, because Marra/Majestic had a contractual duty to field verify the condition before agreeing to commence work. Moreover,

7

Marra/Majestic waived any additional claims by accepting final payment under the contract without making a timely claim for the alleged new condition. Each of these reasons standing alone is sufficient to defeat all of Marra/Majestic's claims against [the Sewer District].

(Doc. 41, memorandum in support, at 2-3.)

The Sewer District argues that Marra is "seeking recovery for an allegedly 'catastrophic' site condition, but its allegations that its failure to comprehend the sizes of the manholes on the Project are 'catastrophic' are not, and cannot be, supported by any possible facts."  (Doc. 41, at 12.)  The Sewer District contends that, under Request for Proposal 10A, Marra had responsibility to "field verify" the accuracy of any existing physical conditions.  Id. at 7, 15-16.  Further, Change Order No. 7 was meant to resolve all past, present and future claims, including those concerning Differing Site Conditions, "unless something catastrophic is encountered (e.g. collapsed tunnel or hazardous waste as defined under RCRA)."  Id. at 8, 13-14.  Moreover, even if such a claim could be raised, Marra failed to assert the claim in a timely manner.  Id. at 12, 16-17.

Marra responds that numerous factual issues exist, and construing the Third-Party Complaint in the light most favorable to them, judgment on the pleadings is precluded.  (Doc. 43, UNDER SEAL.)  Marra asserts that any responsibility to "field verify" the accuracy of existing conditions, although stated in the Request for Proposal, was not included in the final, negotiated Change Order No. 7.  See doc. 43, at 10-11; compare doc. 30, UNDER SEAL, DX B, Change Order No. 7; doc. 37, DX G; with doc. 37, DX D, RFP 10A.

8

Ordinarily, a motion for judgment on the pleadings would be limited to the factual allegations of the complaint.  The court construes the complaint in the light most favorable to the nonmoving party, accepts factual allegations as true, and determines whether the moving party is entitled to judgment as a matter of law. Commercial Money Center, Inc. v. Illinois Union Ins. Co., 508 F.3d 327, 336 (6th Cir. 2007).  However, the Sewer District argues that the contract and numerous other exhibits attached to either the Third-Party Complaint or the Counterclaim should be considered by the court in ruling on this motion.  (Doc. 41, at 4 n.3.)  They also assert that Marra has admitted the authenticity of these documents, which assertion Marra has not denied.  See generally doc. 41, at 4 n.3, and doc. 46.

Documents which are attached to the pleadings become part of the pleadings, and may be considered on a motion to dismiss.  Commercial Money Center, 508 F.3d at 335 (citing Fed. R. Civ. P. 10(c)).  "In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment."  Id. at 335-336; Weiner v. Klais and Co., Inc., 108 F.3d 86, 89 (6th Cir. 1997).

However, when a party presents matters outside the pleadings, the motion is to be treated as a motion for summary judgment.  Fed. R. Civ. P. 12(d); Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc., 452 F.3d 494, 502-503 (6th Cir. 2006) (discussing former Rule 12(c)); Wilson v. Karnes, No. 2:06CV392, 2007 WL 4207154, at *2 (S.D. Ohio Nov. 26, 2007).  The Sixth Circuit has adopted a "strict test" on this question.  Wilson, 2007 WL 4207154, at *2.  The Sixth Circuit has ruled that "the

9

mere presentation of evidence outside of the pleadings, absent the district court's rejection of such evidence, is sufficient to trigger the conversion of a Rule 12(c) motion to a motion for summary judgment." Max Arnold, 452 F.3d at 503.  In such a case, the parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); see also Max Arnold, 452 F.3d at 504.

The Sewer District's motion (doc. 41) contains most of the same exhibits which are attached to its Answer to the Third-Party Complaint and Counterclaim (doc. 37).  The exception is a copy of a Sept. 17, 2003, letter from Marra to the Sewer District, which is attached to the Third Party Complaint itself.  (Doc. 37, DX C; doc. 41, ex. H.)  It is not necessary, therefore, to convert the motion into a motion for summary judgment.  Those few exhibits (see, e.g., doc. 43, UNDER SEAL, at 17, referring to Exh. M, meeting minutes) which were not previously attached to either the Third-Party Complaint, or the Answer thereto, are rejected for present purposes, and will not be considered by the court in ruling on this motion.

## IV.  CONTRACT INTERPRETATION

The parties do not dispute the existence of a contract between them.  The dispute arises over the interpretation of certain terms of the contract.  As mentioned earlier, the following portion is at issue:

> [Marra] will take responsibility for the entire job and shall waive all claims related to the performance of work under the Contract, including, but not limited to, Differing Site Conditions, unless

>something catastrophic is encountered (e.g. collapsed tunnel or
>hazardous waste as defined under RCRA).  This waiver of claims
>includes, but is not limited to, claims related to jet grouting, tunnel
>connections, geotechnical or geological conditions, sediment quantities
>or type, flow velocities or quantities and work hours.

(Doc. 30, UNDER SEAL, DX B; doc. 37, DX G, at ¶ 6.)  In part, the parties dispute

whether Marra's discovery of "manhole diameter discrepancies" is a "catastrophic"

differing site condition which would fall outside the waiver.

The interpretation of written contract terms is a question of law.  Royal Ins.

Co. v. Orient Overseas Container Line Ltd., 514 F.3d 621, 634 (6th Cir. 2008);

Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc., 409 F.3d 342, 346

(6th Cir. 2005); Thomas v. Publishers Clearing House, Inc., No. 00-3948, 2002 WL

193935, at *2 (6th Cir. Feb. 5, 2002).  Thus, whether the differing site condition at

issue is "catastrophic" is a legal question that may be decided on a motion for

judgment on the pleadings.  JPMorgan Chase Bank, N.A. v. Winget, 510 F.3d 577,

582 (6th Cir. 2007).

The purpose of contract construction is to effectuate the intent of the parties.

Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co., 210 F.3d 672, 684 -685 (6th Cir.

2000) (quoting Construction Interior Sys., Inc. v. Marriott Family Restaurants, Inc.,

984 F.2d 749, 754 (6th Cir. 1993)); Kelly v. Medical Life Ins. Co., 31 Ohio St.3d 130,

132, 509 N.E.2d 411, 413 (1987).  The intent of the parties is presumed to reside in

the plain language they chose to employ in the agreement.  Royal Insurance, 514

F.3d at 634; Kelly, 31 Ohio St.3d at 132, 509 N.E.2d at 413.  A court should not use

extrinsic evidence to discern the intent of the parties,  but determines their intent

11

from the plain language of the contract. Royal Insurance, 514 F.3d at 634; Lincoln Electric, 210 F.3d at 684 (parol evidence not admitted to vary or contradict written terms).

If a contract is clear and unambiguous, there is no issue of fact to be determined. Lincoln Electric, 210 F.3d at 684; First Nat'l Bank of Van Wert v. Houtzer, 96 Ohio St. 404, 406-407, 117 N.E. 383, 384 (1917). The question of whether the language of an agreement is ambiguous is a question of law. Potti v. Duramed Pharm., Inc., 938 F.2d 641, 647 (6th Cir. 1991). Ambiguity exists if the language is susceptible to two or more reasonable interpretations. Royal Insurance, 514 F.3d at 634 (quoting City of Wyandotte v. Consol. Rail Corp., 262 F.3d 581, 585 (6th Cir. 2001); Potti, 938 F.2d at 647; Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir. 1985). When a contract is ambiguous, it is for the jury to determine the meaning of its terms. Royal Insurance, 514 F.3d at 634 (quoting Scott v. Anchor Motor Freight, Inc., 496 F.2d 276, 280 (6th Cir. 1974)); Potti, 938 F.2d at 647.

A.  Catastrophic Site Condition

Under the Change Order, Marra waived "all claims related to the performance of work under the Contract, including, but not limited to, Differing Site Conditions, unless something catastrophic is encountered . . . [The] waiver of claims includes, but is not limited to, claims related to jet grouting, tunnel connections, geotechnical or geological conditions, sediment quantities or type, flow

velocities or quantities and work hours.  (Doc. 30, UNDER SEAL, DX B; doc. 37, DX G, at ¶ 6.)

Marra asserts that a "catastrophic" condition was encountered.  Marra alleges that the dimensions of manholes provided by the Sewer District's engineer contained "critical errors," specifically, that the diameters of the manholes were significantly narrower than represented.  (Doc. 30, UNDER SEAL, at p. 14, ¶¶9-10.)  The Third-Party Complaint alleges:

> Each manhole was to be utilized as access to clean the EI Tunnel.  The diameters of the manholes are extremely critical for the cleaning operations for items including, but not limited to equipment installation, maintenance and removal, capability to effectively remove sediment, man entry, bypass pumping and ventilation needs.

Id. at pp. 14-15, ¶ 11.  The errors in the dimensions provided allegedly resulted in "a problem that was catastrophic in nature in that [Marra] could not accomplish the cleaning with the methods and within the time anticipated by Change Order No. 7." Id. at 15, ¶ 12.

Although Marra presented an alternative method of cleaning the tunnel, the Sewer District essentially rejected this proposal, without additional modifications. Marra eventually completed the cleaning as contracted, but at the time of the Third-Party Complaint "calculated its damages as a result of the erroneous manhole diameter dimensions to be $3,761,194.00 which amount included damages for increased subcontractor expense, equipment, labor and certain overhead expenses."  Id. at p. 27, ¶ 50.

In its motion, the Sewer District stresses that Change Order No. 7 was meant to resolve all past, present and future claims, including those concerning Differing Site Conditions, "unless something catastrophic is encountered (e.g. collapsed tunnel or hazardous waste as defined under RCRA[3])." (Doc. 41, at 8, 13-14.)  Although the Change Order does not contain a "definitions" section, the examples provided "demonstrate that a mere failure to recognize or properly represent site conditions is not 'catastrophic.'  Rather, conditions that are 'catastrophic' under the Contract are those that result from a catastrophe, such as a tunnel collapse or environmental contamination."  Id. at 14 (emphasis in original).  The Sewer District contends that Marra's allegations amount to no more than a claim for another "differing site condition," which has been expressly waived by the Change Order.  Id.

The issue, then, is whether the situation encountered by Marra was "catastrophic," such that their claim for damages would survive the waiver of all claims concerning differing site conditions.

Where there is no definition of a disputed word in a contract or a statute, as here, the court determines the common meaning or common understanding of a

---

[3] Under the Resource Conservation and Recovery Act (RCRA) of 1976, "[t]he term 'hazardous waste' means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed."  42 U.S.C. § 6903(5).

14

word by reference to the standard dictionaries.  See, e.g., Amoco Prod. Co. v. Southern Ute Indian Tribe, 526 U.S. 865, 874-875 (1999); Victor v. Nebraska, 511 U.S. 1, 16 (1994); Reiter v. Sonotone Corp., 442 U.S. 330, 338 (1979).

The word "catastrophic" is an adjective arising from the root word "catastrophe."  The dictionary definition of "catastrophe" in this context is "any great and sudden calamity, disaster, or misfortune."  Webster's New World College Dictionary 230 (4th ed. 2007).  A similar definition is found in Webster's Third – "a momentous tragic usu[ally] sudden event marked by effects ranging from extreme misfortune to utter overthrow or ruin: disaster."  Webster's Third New International Dictionary 351 (1981).

Case law also provides some assistance, albeit in differing contexts.  In Anderson v. United States Dept. of Labor,  422 F.3d 1155, 1160 (10th Cir. 2005), there is reference to a "catastrophic risk zone," meaning an area where "the chance of somebody being injured or killed was high."  In Tate v. Boeing Helicopters, 140 F.3d 654, 660 (6th Cir. 1998), a "catastrophic" malfunction of an aircraft component indicated that the malfunction would "cause death or severe injury of personnel or system loss."

The two examples of "something catastrophic" (i.e., "collapsed tunnel or hazardous waste") given in the Change Order are physical conditions that are perilous to workers and others in the same sense as used in Anderson and Tate.  A tunnel collapse, particularly with workers involved, would certainly be considered

an unanticipated, sudden calamity.  Exposure to previously undiscovered hazardous waste could be an extreme misfortune or calamity for the health of those exposed.

In contrast, the alleged "differing site condition" encountered by Marra was neither sudden nor perilous.  The Sewer District argues that the field condition of the manholes cannot be described as "catastrophic" because Marra should have been able to ascertain the condition (indeed, had a duty to verify the condition) prior to entering into the waiver in the Change Order.  (Doc. 41, memorandum in support, at 2-3.)

Without deciding whether Marra was duty-bound to ascertain the actual dimensions of the manhole entries, the court finds that the differing site condition encountered by Marra, that is, the varying dimensions of the manhole entries, was not a "catastrophic" condition as set forth in the Change Order, which would fall outside the waiver negotiated by the parties.  Therefore, the allegations of the Third-Party Complaint fail to support the claim that the Sewer District materially breached the contract by declining to compensate Marra for costs related to the claimed "differing site condition," because such a claim was explicitly barred by Change Order No. 7.

### B.  Ohio Revised Code § 4113.62

Marra contends that the waiver provision in the Change Order is invalid pursuant to Ohio Revised Code § 4113.62.  (Doc. 43, UNDER SEAL, at 8.)  The Sewer District argues that the statute "does not prohibit parties from negotiating a settlement of future delay claims, so it does not apply here."  (Doc. 46, at 5-6.)

16

In 1998,  the Ohio legislature enacted Ohio Rev. Code § 4113.62 which "declared no-damages-for-delay clauses void and unenforceable as against public policy 'when the cause of the delay is a proximate result of the owner's act or failure to act.'" Dugan & Meyers Constr. Co., Inc. v. Ohio Dept. of Adm. Servs., 113 Ohio St.3d 226, 231-232, 864 N.E.2d 68, 74 (2007) (quoting Ohio Rev. Code § 4113.62(C)(1)).  The statute also declared any other contractual provision void that "waives any other remedy for a construction contract when the cause of the delay is a proximate result of the owner's act or failure to act." Id.

The first issue is whether the waiver provision of the Change Order can be construed as a "no-damages-for-delay clause" which might invoke the statute.  The statute was specifically targeted at boilerplate language which had been in common use, stating typically that "any extension of time granted . . . shall be the sole remedy which may be provided by [party A], and [party B] shall not be entitled to additional compensation or mitigation of liquidated damages for any delay."  See, e.g., Dugan & Meyers, 113 Ohio St.3d at 231, 864 N.E.2d at 74; Cleveland Constr., Inc. v. Ohio Public Emps. Retirement Sys., No. 07AP-574, 2008 WL 885841, at *2 (Ohio Ct. App. Apr. 3, 2008).  However, the statute as written is broad enough to specifically encompass other contractual provisions that waive remedies for delay caused as "a proximate result of the owner's act or failure to act." Dugan & Meyers, 113 Ohio St.3d at 232, 864 N.E.2d at 74.  The public policy behind the statute, then, excludes waivers of claims for delays caused by the owner.

17

The Change Order at issue here was a negotiated addendum to the main

contract, compensating Marra in the amount of $4,400,000 for:

> . . . full compensation for the extra work in the Terms and Conditions
> contained herein, . . . all claims for additional compensation, costs,
> damages related to past impacts, delays, loss of productivity,
> disruption and fees arising from circumstances  related to this
> Contract to date and for all future claims which may arise in
> connection with the performance of work under this Contract, as noted
> in paragraph 6.

(Doc. 30, UNDER SEAL, DX B; doc. 37, DX G, at ¶ 1.)  "Paragraph 6" is the waiver

provision which has been discussed.  (Doc. 30, UNDER SEAL, DX B; doc. 37, DX G,

at ¶ 6.)

Apparently, then, the main Contract did not bar compensation for damages

due to delay.  In the Change Order, the parties negotiated an amount which would

compensate Marra for past delays, as well as any future claims for delay.  Rather

than foreclosing a remedy for delay damages, the Change Order represents the

parties' negotiated valuation of any delays, both past and future.

In addition, the waiver of claims for "differing site conditions" does not

preclude all damages for delays, but rather limits the type of delays which are

outside the waiver.  The waiver provision addresses claims related to differing site

conditions such as, "jet grouting, tunnel connections, geotechnical or geological

conditions, sediment quantities or type, flow velocities or quantities and work

hours."  (Doc. 30, UNDER SEAL, DX B; doc. 37, DX G, at ¶ 6.)  These types of pre-

existing physical conditions would not appear to cause "delays" that would

18

ordinarily be attributed to the owner.  Even so, the waiver does not preclude remedies for differing site conditions which are "catastrophic."

In B.I. Chipping Co. v. R.F. Scurlock Co., No. 04AP-1219, 2005 WL 3484306, at *5 (Ohio Ct. App. Dec. 20, 2005), the court found that the appellant had agreed to accept limitations on the delay-related damages that could be recovered.  Thus, it found the contract at issue was not invalid as a contract which contained a clause waiving or precluding liability for delay, prohibited by Ohio Rev. Code § 4113.62(C). Similarly, the Change Order does not preclude all liability for delay, but merely represents an agreed valuation of any past and future delays, thus it is not invalidated by Section 4113.62(C).  Indeed, it would be ironic for this court to find that a negotiated agreement which compensates Marra to the tune of $4.4 million dollars for past delays and future claims could be prohibited under state law on the theory that it precludes the very remedy which it provides.

The motion for judgment on the pleadings should be granted as to the breach of contract claim against the Sewer District.


V.  CLAIM FOR INDEMNIFICATION AND/OR CONTRIBUTION

In the third claim of the Third-Party Complaint, Marra alleges that final payment under the contract was contingent upon an inspection (and acceptance) of the work by the Sewer District's engineer.  The Sewer District, not Marra, was allegedly responsible for performing the necessary inspections in a timely manner. Marra contends that a significant portion of plaintiff Inland's claims are based on

19

Marra's purported failure to timely inspect plaintiff's cleaning work.  (Doc. 30, UNDER SEAL, at p. 32.)  Therefore, Marra "is entitled to complete indemnification and/or contribution from the [Sewer District] as it was the [Sewer District]'s exclusive duty and responsibility to timely inspect Plaintiff's cleaning work in the EI Tunnel and the levels of sediment in the EI Tunnel."  Id. at pp. 32-33.

Marra points out that the Sewer District does not address this claim in its motion for judgment.  See generally doc. 41, memorandum in support; doc. 43, UNDER SEAL, at 7-8.

The Sewer District responds that the court should read an argument against the indemnification claim as subsumed in its factual recitations concerning the waiver in the Change Order.  (Doc. 46, at 3, citing doc. 41, memorandum in support, at 8.)

However, as Marra notes, the motion itself does not move for judgment on the indemnification claim.  Raising the matter in a reply brief is insufficient.  See, e.g., Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 553 (6th Cir. 2008) (quoting Novosteel SA v. U.S., Bethlehem Steel Corp., 284 F.3d 1261, 1274 (Fed. Cir. 2002)); Rush v. Illinois Cent. R.R. Co., 399 F.3d 705, 727 n.19 (6th Cir. 2005), cert. denied, 546 U.S. 1172 (2006); Bishop v. Oakstone Academy, 477 F.Supp.2d 876, 889 (S.D. Ohio 2007).  Marra's claim for indemnification and/or contribution survives.

## VI.  SUMMARY

The motion for judgment on the pleadings (doc. 41) should be GRANTED as to the breach of contract claim in the Third-Party Complaint.

## RECOMMENDATION

It is recommended that the motion be granted.


Dated:   June 17, 2008          /s/ Kenneth S. McHargh
                                Kenneth S. McHargh
                                United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the District Court's order.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).